[Cite as *Hogue v. PP&G Oil Co., L.L.C.*, 2024-Ohio-2938.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MONROE COUNTY

DONALD V. HOGUE ET AL.,

Plaintiffs-Appellees,

v.

PP&G OIL COMPANY, LLC ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 23 MO 0021, 23 MO 0023**

---

Civil Appeal from the
Court of Common Pleas of Monroe County, Ohio
Case No. 2021-191

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed, Vacated and Remanded.

---

*Atty. Timothy B. Pettorini, Atty. Michelle F. Noureddine* and *Atty. Jeremy D. Martin,* Roetzel & Andress, LPA, for Plaintiffs-Appellees Donald V. Hogue and Julie Hogue and

*Atty. John Kevin West* and *Atty. John C. Ferrell,* Steptoe & Johnson, PLLC, for Defendants-Appellants Gulfport Energy Corporation and Gulfport Appalachia, LLC and

*Atty. Richard A. Yoss* and *Atty. Jason A. Yoss*, Yoss Law Office, LLC, for Defendant-Appellant PP&G Oil Company, LLC.

Dated:  August 1, 2024

**Dickey, J.**

{¶1}   Appellants, PP&G Oil Company, LLC ("PP&G"), and Gulfport Energy Corporation and Gulfport Appalachia, LLC (collectively "Gulfport"), appeal the judgment entry of the Monroe County Court of Common Pleas entering summary judgment in favor of Appellees, Donald V. Hogue and Julie Hogue, and overruling Appellants' cross-motions for summary judgment in this declaratory judgment action to determine the ownership of a fractional leasehold interest in the deep rights underlying four drill site units.  In addition to a declaratory judgment, Appellees seek damages based on the alleged breach of a 2007 assignment from PP&G to Appellees of a 2.5% working interest in the oil and gas underlying four 20 acre drill site units, as well as conversion, and unjust enrichment. All of the claims are based on PP&G's subsequent subleasing of the deep rights underlying the drill site units without compensation to Appellees.  After being joined in the action, Gulfport, the successor in interest of the subleased deep rights in two of the drill site units, filed a counterclaim seeking a declaratory judgment that the working interest assignment did not convey any interest in the deep rights, and an order quieting title to its leasehold interest in the deep rights.

{¶2}   Because this action is governed by the 21-year property statute of limitations, and the 2007 assignment is unambiguous, limiting the drilling rights to a maximum depth of 4,000 feet, the judgment entry granting summary judgment to Appellees is reversed and vacated, and judgment is entered in favor of Appellants on Appellees' claims for declaratory judgment, breach of contract, conversion, and unjust enrichment. Further, this matter is remanded to the trial court to address Gulfport's request for an order quieting title to its leasehold interest in the deep rights.

## FACTS AND PROCEDURAL HISTORY

{¶3}   PP&G is an Ohio-based company engaged in the drilling, development, and production from various oil and gas leases and the associated wells in southeastern Ohio. In 2007, PP&G planned to drill four wells on properties where it held the oil and gas rights through previously-acquired leases.  PP&G solicited Appellees to invest in the funding of

drilling these four wells, which was a common practice for oil and gas companies to seek funding for exploration.

{¶4}  Pursuant to a Participation Agreement between PP&G and Appellees executed on March 1, 2007, Appellees purchased "a 2.5% working interest (equal to a 2.1875% each net revenue interest) in the four Wells" for $4,000, for a total initial investment of $16,000.  In the Participation Agreement, PP&G identifies itself as the "owner of the working interest in (4) 20 acre drill sites located in Center, Wayne, Wayne, Center Townships, Monroe County, Ohio known as Gatten #1, Drake #1, Jurmanovich #1, Enlow #1 Wells," collectively referred to as the Gatten Group Wells.

{¶5}  The Participation Agreement includes additional provisions regarding the parties' rights and obligations in connection with the 20 acre drill site units. The Participation Agreement provides:

> After it is determined that the wells will be commercially productive, [PP&G]
> shall assign [Appellees] a 2.5% each working interest (equal to a 2.1875%
> each net revenue interest) in the Gatten Group (4) Well 20 Acre Units. Said
> assignments shall assign rights to [Appellees] only from the surface to the
> bottom of the deepest producing geological formation.

(Participation Agreement at ¶ 4.) The Participation Agreement further provides, "[Appellees] acknowledge[ ] and understand[ ] that the purchase price for the working interest . . . is based upon the turn-key cost to drill and complete all four wells," (*Id.* at ¶ 2), and "[t]he wells will be drilled to the Devonian Shale Formation at an estimated depth of 2900 feet."  (*Id.* at ¶ 1.)

{¶6}  Approximately eight months after the Participation Agreement was executed, PP&G entered into an Assignment of Working Interest ("Assignment") with Appellees.  This assignment is at issue in this appeal.  It was executed on November 2, 2007, and reads in relevant part:

> That the undersigned, [PP&G], . . . does hereby assign, transfer, sell and
> convey unto [Appellees], herein called Assignee, an undivided 2.5%
> working interest in and to the Gatten #1, Drake #1, Jurmanovich #1, and

Enlow #1 wells *and the related 20 acre drill site unit, together with the rights incident thereto and the personal property therein.*

(Emphasis added) (Assignment, p. 1.)  The Assignment was recorded in the public land records and marginally notated to the leases under which the 20 acre drilling site unit existed.

**{¶7}** Between March 3, 2007 and June 22, 2007, PP&G drilled the Gatten Group wells to depths between 2,313 to 2,460 feet.  R.C. 1509.01, captioned "Definitions," reads in relevant part, "(G) 'Drilling unit' means the minimum acreage on which one well may be drilled . . . ."  In 2007, Ohio's well spacing regulations provided wells drilled between 2,000 and 4,000 feet required a drilling unit of at least 20 acres and at least 300 feet of distance between the well and the nearest unit boundary.  Ohio Adm.Code 1501:9-1-04(C)(3)(a), (c) (effective Aug. 11, 2005). Wells drilled below 4,000 feet required a drilling unit of at least 40 acres and at least 500 feet of distance to a unit boundary. Ohio Adm.Code 1501:9-1-04(C)(4)(a), (c).

**{¶8}** Appellees do not dispute they have continued to receive their production payments according to their working interest in each of the four vertical wells and the related 20 acre drill site units through the Assignment.  These payments have continued throughout the above-captioned litigation.

**{¶9}** On June 27, 2011, PP&G executed a sublease with HG Energy, LLC ("HG Energy") of its entire working interest in numerous leases, which included the four 20 acre drill site units in which Appellees owned a fractional interest, from "the top of the Clinton formation to the basement."  PP&G, like the majority of other local oil and gas companies, subleased their interest in the formations below the Marcellus formation, which Appellants do not dispute is below 4,000 feet.

**{¶10}** In September of 2012, Antero Resources ("Antero") expressed an interest in acquiring the Drake #1 lease, which is one of the four wells in the Gatten Group.  Based on the Assignment, representatives from Antero were of the opinion that investors in the Drake #1 well possessed an interest in the 20 acres surrounding the well, without any depth limitation.

**{¶11}** On June 12, 2013, PP&G and HG Energy executed an Amendment and Ratification of Oil and Gas Sublease, which excluded the Drake #1 and Jurmanovich #1

leases from the Sublease, leaving only the Gatten #1 and Enlow #1 leases. HG Energy subsequently conveyed all of its rights, title and interest in the Sublease to American Energy-Utica, LLC. The parties agree the rights to the Sublease were assigned to Gulfport Energy, and ultimately assigned to Gulfport Appalachia.

{¶12} On July 20, 2013, PP&G contacted Appellees to notify them that Antero had requested investors quit claim the 20 acres relating to the Drake #1 back to PP&G. The July 20th correspondence reads in relevant part:

> When you elected to invest in these wells there was an understanding that you were getting an interest in only the wells. When our lawyer drew up the assignment[,] he worded it that you got an interest in the wells and the surrounding 20 acres. Seeing as there was no way to foresee the attention Monroe County is getting right now, his wording in the assignment was understandable.

{¶13} On August 17, 2013, PP&G sent a second letter to Appellees, which read that investors could assign their interest directly to Antero. Based on Antero's belief that Appellees owned all of the oil and gas underlying the 20 acres surrounding the Drake #1, Appellees sold and assigned their interest to Antero. Investors, including Appellees, received their proportionate share of the assignment bonus from Antero.

{¶14} At his deposition, Donald V. Hogue testified that Appellees wanted to file the above-captioned lawsuit sooner, but "it took [him] three years to find [an attorney]. And [the attorney] is so busy all the time, he didn't have enough time to file it when [Mr. Hogue] wanted [the attorney] to file it." (Deposition of Donald V. Hogue, p. 40).

{¶15} Mr. Hogue provided the following testimony regarding his knowledge of execution of the Sublease:

> Q: So you've alleged in this case that PP&G purported to sublease the deep rights under these 20 acre drill sites to HG Energy. I'm going to represent to you that that is an allegation in the complaint you filed in this case. When did you first find out about the sublease?

A:    I can't tell you if they was [sic] actually subleased, because that would be more or less of a – I don't know if you would want to call it hearsay. We never received any correspondence from them on who they subleased it to [sic]. The only correspondence we received was the Antero stuff.

Q:    You said you never received any correspondence "from them." Do you mean PP&G?

A:    Yes, as far as what they was [sic] doing with HG. I have a friend that's in the same 25,000 acre loop. He kept me informed of what was going on.

Q:    So when did he first tell you about that?

A:    When the inception of it was.

Q:    Do you mean when the sublease was signed?

A:    Yes.

(*Id.* at p. 41-42.)

{¶16} Appellees assert the Assignment does not contain an express depth restriction and based on case law from the Fourth and Fifth Districts, this is a conveyance of the minerals from the surface to the center of the Earth (deep rights). Appellees assert PP&G's subleasing of the deep rights without compensation to Appellees violated the Assignment. Appellees sought summary judgment that the Assignment was unambiguous, arguing that it plainly conveyed a fractional interest in the Gatten Group wells and the related 20 acre drill site unit, together with the rights incident thereto and the personal property therein, without any depth limitation.

{¶17} PP&G also sought summary judgment. They asserted Appellees' claims were procedurally barred by the statute of limitations applicable to contracts and the doctrine of latches. Gulfport similarly argued the statute of limitations applicable to contracts barred Appellees' claims. Appellants argued the Assignment was

Case Nos. 23 MO 0021, 23 MO 0023

unambiguous, but asserted PP&G did not assign the deep rights in the Assignment based on the legal definition of "drilling unit" in Ohio at the time of the execution of the Assignment, as well as the language in the Participation Agreement.

**{¶18}** On April 13, 2023, the trial court issued the judgment entry on appeal awarding summary judgment to Appellees. The trial court did not address the statute of limitations argument. The trial court concluded the language of the Assignment was unambiguous and granted all the oil and gas in the drilling site units to Appellees, without any depth limitation (deep rights). As a consequence, the trial court entered judgment in favor of Appellees on all of their claims.

**{¶19}** The trial court predicated its conclusion on the Southern District of Ohio's 2022 decision in *Sabre Energy Corp. v. Gulfport Energy Corp.*, 2022 WL 4376228 (S.D. Ohio Sep. 27, 2022) ("*Sabre I*"). In that case, Sabre claimed an interest in overriding royalty interests in deep rights, due to an alleged breach of two 1992 assignments of overriding royalty interests in certain drilling units, which had been assigned in conjunction with shallow wells, less than 4,000 feet depth. The assignments granted net revenue interests "to [the specified wells] and the drilling units associated therewith." *Sabre I* at *1.

**{¶20}** Sabre argued the assignment of ORRIs in drilling units conveyed an interest in all oil and gas beneath the surface in the area where the associated wells were drilled. Gulfport countered the contractual right to ORRIs was limited to the depths and formations into which the associated wells were drilled.

**{¶21}** On cross-motions for judgment on the pleadings, the district court opined:

> The term "drilling unit" is unambiguous. Ohio law defines "drilling unit" as "the minimum acreage on which one well may be drilled...." Ohio Rev. Code § 1509.01(G). This "minimum acreage" is based on the depth of the well. *See* Ohio Admin. Code 1501:9-1-04(C). The deeper the well, the greater the minimum acreage required. The largest required drilling unit is 20 acres, which is required to reach depths in excess of 4,000 deep. Ohio Admin. Code 1501:9-1-04(C)(4).

Case Nos. 23 MO 0021, 23 MO 0023

The assignment of ORRIs in drilling units contains inherent limitations. An interest in a drilling unit is limited to the production capability of that drilling unit. The production capability of a drilling unit is determined by its acreage. For example, a drilling unit of 10 acres can produce oil and gas only up to 4,000 feet below the surface. [N]ever 4,001 feet. *See* Ohio Admin. Code 1501:9-1-04(C)(3). The assignment of ORRIs in a drilling unit does not assign an interest in oil and gas which is forever out of reach of a well on that drilling unit.

*Id.* at *2.

{¶22} The district court ultimately concluded questions of fact remained regarding the production capabilities of the drilling units:

Well drilling permits reveal that the assigned wells are of varying depths, ranging from 2,500 to 5,500 feet. Doc. 48-2. It is likely, then, that the associated drilling units are of varying acreages. Some of the wells, those drilled to a depth of 4,000 feet or greater, likely have a drilling unit of at least 20 acres and therefore contain no limitation on depth. *See* Ohio Admin. Code 1501:9-1-04(C)(4) (requiring that wells for the production of oil and gas from a pool greater than four thousand feet in depth be located on a "drilling unit containing not less than twenty acres...."). Others, however, may be on smaller drilling units which have depth limitations. As there remain questions on the production capabilities of the drilling units as well as which drilling units Defendants drilled underneath, judgment on the pleadings on Sabre's breach of contract claim is inappropriate.

Defendants suggest an ORRI in a drilling unit is limited to the depth and formation specified in the associated well's drilling permit. They assert that drilling permits authorize wells to be drilled at specified depths and into specified formations and that wells cannot be drilled deeper without prior permission. This argument misses the mark. The Assignments' grant of ORRIs in drilling units is not limited to the limitations imposed by the

associated wells' current drilling permits, especially as those limitations could be modified upon request without changing the drilling unit.

*Id.* at *2-3.

{¶23} Significantly, the district court in *Sabre I* relied on the then-current Ohio Administrative Code, which required only a 20 acre drill site unit for exploration below 4,000 feet, rather than the version of the Code in effect at the time the assignments were executed, which required a 40 acre drill site unit for exploration below 4,000 feet. As a consequence, the district court errantly concluded that the 20 acre drilling units at issue in that case were not depth-limited.

{¶24} On June 8, 2023, the district court, sua sponte, rescinded *Sabre I*. On July 21, 2023, the district court filed an Opinion and Order granting summary judgment in favor of Gulfport. *Sabre Energy Corp. v. Gulfport Energy Corp.*, 2023 WL 4686357 (S.D. Ohio July 21, 2023) ("*Sabre II*"). The district court acknowledged its previous error in *Sabre I* regarding the version of the Code applicable to the resolution of the case. The district court recognized *Sabre II* applied "the regulations as they existed at the time the Assignments were executed as those regulations controlled the parties' understanding of a drilling unit." *Id.* at n. 2. Based on the definition of "drilling unit" in the Code when the assignment was executed, the district court concluded the assignment conveyed an ORRI solely in the shallow rights. *Sabre II* is currently pending before the Sixth Circuit Court of Appeals.

{¶25} Relying on *Sabre I*, the trial court in the above-captioned appeal concluded, "this Court finds in the within case that the Assignment language of a 'drill site unit' is virtually identical to the Sabre Energy Assignment. As a result, this Court finds that PP&G granted to [Appellees] an interest in the 20 acre drilling units included in the Gatten Group Wells." (4/13/23 J.E., p. 7.)

{¶26} Both PP&G and Gulfport filed motions for reconsideration of the April 13, 2023 Judgment Entry. They argued the *Sabre I* Court erred in relying on the current version of the Code, rather than the version in effect when the Assignment was executed. On June 9, 2023, PP&G filed a Supplemental Memorandum in Support of its

Case Nos. 23 MO 0021, 23 MO 0023

Motion for Reconsideration predicated upon the rescission of *Sabre I*. On June 14, 2023, the trial court overruled Appellants' motions for reconsideration.

**{¶27}** On August 2, 2023, PP&G filed its Second Motion for Reconsideration, in which Gulfport joined. The second motion was predicated upon *Sabre II*, and urged the trial court to use the version of the Code in effect at the time the Assignment was executed, not the current version. On September 11, 2023, the trial court summarily denied PP&G's Second Motion for Reconsideration.

**{¶28}** On October 13, 2023, the parties filed a pleading captioned, "Stipulation As To Damages." The stipulation was explicitly made subject to PP&G and Gulfport's right to appeal the trial court's prior judgment entries. On November 1, 2023, the trial court filed a Final Judgment in this case in favor of Appellees. These timely consolidated appeals followed.

## SUMMARY JUDGMENT STANDARD

**{¶29}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a de novo review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Beckett v. Rosza*, 2021-Ohio-4298, ¶ 21 (7th Dist.).

**{¶30}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting

forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs*, 2018-Ohio-5402, ¶ 11 (7th Dist.).

**{¶31}** The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

## ANALYSIS

**{¶32}** Gulfport raises one assignment of error with three sub-issues. All three sub-issues are similar in nature to PP&G's assignments of error and will be addressed together as explained below.

### [GULFPORT'S] ASSIGNMENT OF ERROR

### THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO [APPELEES] AND DENYING SUMMARY JUDGMENT TO GULFPORT.

**{¶33}** Gulfport's sole assignment of error is divided in three parts. First, Gulfport argues Appellees' claims are barred by the statute of limitations applicable to actions in contract. Gulfport's argument with respect to the applicable statute of limitations shall be addressed with PP&G's second assignment of error.

**{¶34}** Next, Gulfport asserts the trial court should have considered the terms of the Participation Agreement as the agreement and the Assignment are parts of a single transaction. In the alternative, Gulfport argues the trial court need not conclude the assignment was ambiguous in order to consider the Participation Agreement, as the Participation Agreement relates to the practical construction of the Assignment. Gulfport's arguments regarding the Participation Agreement will be addressed with PP&G's third assignment of error.

**{¶35}** Finally, Gulfport contends the phrase "drill site unit" contains an inherent depth limitation based on the legal definition of "drilling unit" in Ohio at the time the

Assignment was executed. Gulfport's argument relating to contract interpretation will be addressed with PP&G's first assignment of error.

{¶36} PP&G's assignments of error are addressed out of order for clarity of analysis.

### PP&G'S SECOND ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED BY NOT RULING ON ALL ISSUES RAISED BY [PP&G], INCLUDING THAT [APPELEES'] CLAIMS WERE BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS AND/OR THE DOCTRINE OF LACHES.**

{¶37} The trial court did not address Appellants' statute of limitations challenge. However, because the Court reached the merits of the case, it is inherent in its conclusion it found the matter was not procedurally barred. Appellants contend this case is controlled by R.C. 2305.06, the eight-year statute of limitations governing contracts. Appellees argue the matter is controlled by R.C. 2305.04, the twenty-one-year statute of limitations governing property.

{¶38} In determining which limitations period applies, courts in Ohio "look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded. The grounds for bringing the action are the determinative factors, the form is immaterial." *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183 (1984). A declaratory judgment action seeks the court's guidance on the construction or validity of the parties' rights and legal relations arising under a "deed, will, written contract, or other writing constituting a contract." R.C. 2721.03.

{¶39} Ohio, like a majority of states, recognizes minerals underlying the surface of real property are part of the realty but may be severed from the surface estate for purposes of separate ownership. *Chesapeake Exploration, L.L.C. v. Buell*, 2015-Ohio-4551, ¶ 21-22. In *Browne v. Artex Oil Co.*, 2019-Ohio-4809, the Ohio Supreme Court acknowledged that oil and gas leases "straddle the line between property and contract," but that "Ohio is in line with the general consensus among the states that an oil and gas lease creates a real-property interest." *Id.* at ¶ 22, citing R.C. 5301.09, 2014 Sub.H.B.

No. 9 (effective Mar. 23, 2015) (recognizing that oil and gas leases "create an interest in real estate").

**{¶40}** During the term of the lease, "the lessor effectively relinquishes his or her ownership interest in the oil and gas underlying the property in favor of the lessee's exclusive right to those resources." *Chesapeake*, at ¶ 62. The lessee also enjoys reasonable use of the surface estate to accomplish the purposes of the lease. *Id.* at ¶ 60. Based on the vested nature of the grant, an oil and gas lease has been construed as transferring to the lessee "a fee simple determinable in the mineral estate with a reversionary interest retained by the lessor that can be triggered by events or conditions specified in the lease." *Id.* at ¶ 61, citing *Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129-130 (1897).

**{¶41}** The parties in a typical oil and gas case are the surface owner (lessor) and the oil and gas company (lessee). Here, the parties are both lessees, that is, PP&G with a 97.5% working interest in the wells and the drilling site units minus percentages assigned to other assignees that are not parties to this case, if any, and Appellees with a 2.5% working interest in the wells and drilling site units.

**{¶42}** Appellants contend R.C. 2305.06, the statute of limitations governing contracts, is applicable to Appellees' declaratory judgment action. On September 28, 2012, the Legislature amended R.C. 2305.06 changing the statute of limitations for an action on a written contract from 15 years to eight years. R.C. 2305.06. The General Assembly explained if the cause of action accrued prior to September 28, 2012, the statute of limitations is the lesser of 15 years from the date of accrual or eight years from September 28, 2012, which was the effective date of the amendment. *U.S. Bank v. Richardson*, 2022-Ohio-4753, ¶ 22 (7th Dist.). The Sublease at issue in this case was executed on June 27, 2011 and the original complaint was filed on May 26, 2021. Therefore, Appellants argue the contractual statute of limitations of eight years controls and the limitations period ended on September 27, 2020.

**{¶43}** However, Appellees cite the Ohio Supreme Court's holding in *Artex* to argue R.C. 2305.04, the 21-year statute of limitations relating to property, applies in this case, making the claims timely filed. Appellees assert the actual nature or subject matter of this

case is the ownership of real property. Specifically, Appellees argue rights in the four 20 acre drill site units and their underlying oil and gas rights are interests in real property.

{¶44} Appellants counter the facts in this case are distinguishable from the facts in *Artex,* because the termination of the oil and gas lease in *Artex* was not based on an alleged breach of the oil and gas lease, but instead the habendum clause in the lease. In rejecting the proposition that the matter was governed by the statute of limitations applicable to contracts, the Ohio Supreme Court reasoned "[t]ermination of a lease pursuant to a habendum clause is not the result of a breach of the lease when nothing in the lease obligates the lessee to maintain the lease into the secondary term or for any term once the secondary term commences." *Artex* at ¶ 38. The *Artex* Court concluded a declaratory judgment action that an oil and gas lease terminated by its own terms is not a contract claim but an action to quiet title.

{¶45} R.C. 2305.04, captioned "recovery of real estate," reads in relevant part, "An action to recover title to or possession of real property shall be brought within twenty-one years after the cause of action accrued . . . ." Appellants argue Appellees seek to recover neither title nor possession of the deep rights in this case. Instead, Appellees assert a simple damages claim predicated upon theories of recovery in contract, tort, and equity.

{¶46} The Assignment coveys a fractional interest in each of the four Gatten Group wells and "the related 20 acre drill site unit, together with the rights incident thereto and the personal property therein." Appellees did not file a quiet title action to recover their property interest in the respective drill site units. Although Appellees did not ask the trial court to invalidate PP&G's assignment of the deep rights, they nonetheless seek a declaration that they owned a 2.5% interest in the deep rights underlying the drill site units prior to the execution of the Sublease and seek to recover damages under the Sublease.

{¶47} Simply because Appellees opted to recover the proceeds of the alleged invalid transfer of their fractional interest, rather than invalidate the Sublease, does not affect the nature of their claim. As a consequence, we reject Appellants' procedural default argument that predicates the applicable statute of limitations in this case on the chosen remedy, rather than the nature of Appellees' claims. We find Appellees' declaratory judgment action asks the trial court to declare the ownership of the fractional

interest in the four 20 acre drill site units and the underlying rights, and therefore, is governed by property statute of limitations of 21-years in R.C. 2305.04.

**{¶48}** Next, PP&G argues the trial court erred in reaching the merits of this case because the equitable doctrine of laches forecloses Appellants' claims. Laches consists of four elements: (1) unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party. *V.T. Larney, Ltd. v. Locust St. Invest. Co., LP*, 2019-Ohio-496, ¶ 40 (7th Dist.), citing *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 74 Ohio St.3d 143, 145 (1995). All four elements must exist for laches to apply.

**{¶49}** The party invoking the doctrine must show the delay caused material prejudice. *Miller v. Cloud*, 2016-Ohio-5390, ¶ 85-86 (7th Dist.), citing *Thirty-Four Corp. v. Sixty-Seven Corp.*, 15 Ohio St.3d 350, 354 (1984). Material prejudice requires actual proof that evidence was lost or the moving party suffered a detriment. *RHDK Oil & Gas, L.L.C. v. Dye*, 2016-Ohio-4654, ¶ 43 (7th Dist.), appeal not allowed, 2017-Ohio-261 (2017), *see also State ex rel. Donovan v. Zajac*, 125 Ohio App.3d 245, 250 (11th Dist. 1998).

**{¶50}** A decision whether or not to apply the defense of laches is within the discretion of the trial court. *DeRosa v. Parker*, 2011-Ohio-6024, ¶ 49 (7th Dist.). Abuse of discretion requires a finding that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, (1983).

**{¶51}** PP&G has failed to assert any material prejudice suffered as a result of Appellees' alleged delay in filing this action. As a consequence, we decline to apply the equitable doctrine of laches in this case.

**{¶52}** In summary, we find Appellees' claims are governed by the 21-year statute of limitations for property set forth in R.C. 2305.06, and the claims were timely filed. Further, the doctrine of laches is not applicable as Appellants have suffered no prejudice. Accordingly, we find PP&G's second assignment of error and that portion of Gulfport's sole assignment of error predicated upon the statute of limitations have no merit.

## PP&G'S FIRST ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED BY GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF [APPELEES].**

{¶53} In its first assignment of error, PP&G argues the trial court applied the wrong version of the OAC 1501:9-1-04(C)(3) in reaching its conclusion that the language of the Assignment conveyed the deep rights to Appellees, because of the trial court's reliance on *Sabre I.* The trial court wrote:

> In [*Sabre I*] the Assignment at issue conveyed a net revenue interest in the "aforementioned wells and the drilling units associated therewith." The Southern District of Ohio Court held that the term "drilling unit" was unambiguous, meaning the "minimum acreage on which one well may be drilled pursuant to Revised Code 1509.01(G).["]

> Likewise, this Court finds in the within case that the Assignment language of a "drill site unit" is virtually identical to the Sabre Energy Assignment. As a result, this Court finds that PP&G granted to Plaintiffs an interest in the 20 acre drilling units included in the Gatten Group Wells.

4/13/23 J.E., p. 7.

{¶54} The trial court further cited case law from the Fourth and Fifth District Courts of Appeals, which holds a granting clause that does not contain terms limiting depth conveys all depths, to find that the deep rights in the fractional interest held by Appellees included the deep rights. *See Am. Energy-Utica, LLC v. Fuller*, 2018-Ohio-3250, ¶ 43 (5th Dist.); *K & D Farms, Ltd. v. Enervest Operating, L.L.C.*, 2015-Ohio-4475 (5th Dist.); *Marshall v. Beekay Co.*, 2015-Ohio-238 (4th Dist.) (production in paying quantities from shallow wells prevented termination of lease relating to deep rights).

{¶55} Earlier this year, the Ohio Supreme Court summarized the application of contract law to oil and gas leases in *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, as follows:

Oil and gas leases are contracts and are subject to the traditional rules of contract interpretation. *Lutz v. Chesapeake Appalachia, L.L.C.*, 148 Ohio St.3d 524, 2016-Ohio-7549, 71 N.E.3d 1010, ¶ 11; *see also Harris v. Ohio Oil Co.*, 57 Ohio St. 118, 129, 48 N.E. 502 (1897). We have explained:

> When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.

*Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 129 Ohio St.3d 397, 2011-Ohio-2720, 953 N.E.2d 285, ¶ 37. " 'As a matter of law, a contract is unambiguous if it can be given a definite legal meaning.' " *Id.*, quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language special meaning." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 667 N.E.2d 949 (1996). " 'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.' " *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652 N.E.2d 684 (1995), quoting *Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc.*, 15 Ohio St.3d 321, 322, 474 N.E.2d 271 (1984). But terms in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. *See Motorists Mut. Ins. Co. v. Ironics, Inc.*, 168 Ohio St.3d 467, 2022-Ohio-841, 200 N.E.3d 149, ¶ 14. It is generally the role of the fact-finder to resolve any ambiguity in a contract. *Westfield Ins.*

*Co.* at ¶ 13. In other words, whether a contract is ambiguous is a question of law, but the resolution of an ambiguous term in a contract is a question of fact. *McOmber v. Liebrecht*, 3d Dist. Van Wert No. 15-22-05, 2023-Ohio-2019, 2023 WL 4078670, ¶ 29; *Atelier Dist., L.L.C. v. Parking Co. of Am., Inc.*, 10th Dist. Franklin No. 07AP-87, 2007-Ohio-7138, 2007 WL 4564304, ¶ 17.

*Id.* at ¶ 11-12.

**{¶56}** R.C. 1.42, captioned "Common and technical usage," reads in its entirety, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage. Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."

**{¶57}** There is no dispute that the Ohio Administrative Code section in effect when the Assignment was executed limited 20 acre drilling units to depths of 4,000 feet. Insofar as Appellees do not dispute the deep rights at issue in this case are below 4,000 feet, we find the trial court erred in applying the current version of the Ohio Administrative Code, in which the largest required drilling unit is 20 acres and allows exploration in excess of 4,000 feet. Ohio Adm.Code 1501:9-1-04(C)(4). The trial court was obliged to determine the parties' intent at the time of the execution of the contract. Because the Ohio Administrative Code at the time the Assignment was executed prohibited drilling below 4,000 feet in drilling units less than 40 acres, we find the Assignment is unambiguous and the unambiguous terms limited Appellees' working interest in the oil and gas to a maximum depth of 4,000 feet.

**{¶58}** We further find the trial court's reliance on case law from the Fourth and Fifth Districts regarding the conveyance of oil and gas rights from a surface owner to an oil and gas company is inapplicable here, where the ownership of the deep rights is specifically predicated upon the conveyance of the four 20 acre "drill site units."

**{¶59}** In *Fuller*, 2018-Ohio-3250 (5th Dist.), the granting clause read, in relevant part:

> ... grant, demise, lease and let unto the said lessee for the sole and only purpose of mining and operating for oil and gas and of laying of pipe lines, and of building tanks, power stations, and structures thereon to produce, save and take care of said products, all that certain tract of land situated in the Township of Londonderry, County of Guernsey, State of Ohio, described as follows, to wit: being all land owned by lessor in Section 13 and 18. ...

*Id.* at ¶ 46. Based on the foregoing language, the Fifth District summarily concluded, "[a]s the granting clause does not contain terms limiting the depth or formation, the rights are granted to all depths. Based on the foregoing, we find the trial court did not err in granting judgment in favor of Appellee on this issue." *Id.* at ¶ 47.

**{¶60}** The Fifth District reached the same conclusion in *K & D Farms, Ltd*, 2015-Ohio-4475 (5th Dist.). The granting clauses in the leases were executed for "exploring, drilling and operating for oil and gas, and all constituents thereof, and all rights necessary, convenient and incident thereto . . . ." *Id.* at ¶ 3. With respect to the request for declaratory judgment, the appellants argued the trial court erred in dismissing their claim because one lease was executed in contemplation of drilling Clinton wells and the leases did not contemplate deeper formations to find isolated pools of oil. Nonetheless, the trial court held there was no language contained in the leases that "limit[ed] the formations from which oil and gas [could] be extracted." *Id.* at ¶ 29.

**{¶61}** Unlike the granting clauses in the foregoing cases, which were silent as to depth limitation, the granting clause in this appeal conveys "an undivided 2.5% working interest in and the [Gatten Group wells] and the related 20 acre drill site unit, together with the rights incident thereto and the personal property therein." At the time the Assignment was executed, the term "20 acre drill site unit" contained a 4,000-foot depth limitation based on the Ohio Administrative Code. Simply stated, the size of the four 20 acre drill site units at issue in this appeal limited exploration for oil and gas to a maximum depth of 4,000 feet. Although the right to explore greater depths within a 20 acre drill site was later expanded in Ohio, our role is to determine the intent of the parties at the time the Assignment was executed. We find the language of the Assignment was unambiguous and did not convey the deep rights to Appellees. Accordingly, Appellants'

Case Nos. 23 MO 0021, 23 MO 0023

first assignment of error and that portion of Gulfport's sole assignment of error predicated upon the Ohio Administrative Code have merit.

## PP&G'S THIRD ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN FINDING PP&G IN BREACH OF CONTRACT.**

**{¶62}** In their third assignment of error, PP&G contends the trial court should have considered the Participation Agreement when interpreting the language of the Assignment. However, Appellants rely on case law that is inapposite based on the facts in this case.

**{¶63}** First, PP&G argues the Participation Agreement and the Assignment are parts of one transaction. In *Susany v. Guerrieri*, 2016-Ohio-1062 (7th Dist.), the plaintiff alleged a breach of a partnership agreement, based on a provision that prohibited modification of a contemporaneously-executed property management agreement, which was attached to the partnership agreement. In finding no breach of the partnership agreement, the trial court considered the terms of a newly-executed property management agreement.

**{¶64}** We affirmed the decision of the trial court, writing:

To determine whether the management agreement was changed, the trial court must consider evidence of whether there was breach of the partnership agreement[,] which provided that the management agreement could not be changed without written consent of the limited partner. Viewing the management agreement to ascertain whether this term of the partnership agreement was breached is distinct from viewing extrinsic evidence due to ambiguous language employed in a contract. A valid use of the management agreement is to determine whether a change was in fact made.

The management agreement has the following important attributes: it was specifically referenced in the partnership agreement as constituting part of the consideration; a specific provision of the partnership agreement was

that the management agreement could not be changed without written consent of the limited partner; and, the management agreement was attached to the partnership agreement as an exhibit.

"A writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole." *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361, 678 N.E.2d 519 (1997). "Where one instrument incorporates another by reference, both must be read together. . . .

*Id.* at ¶ 19-21.

**{¶65}** Here, the interrelationship between the Assignment and the Participation Agreement is far more attenuated than the interrelationship between the property management agreement and the partnership agreement in *Susany.* The Assignment in this case includes no reference to the Participation Agreement, the Participation Agreement is not attached to the Assignment, and the Participation Agreement and the Assignment were not executed contemporaneously. The Participation Agreement was executed eight months prior to the Assignment. Accordingly, we find the law applied in *Susany* is not applicable here.

**{¶66}** Second, Appellants cite *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2007-Ohio-5026, for the proposition that the trial court should have considered the practical construction of the parties. The practical construction of the parties may be considered if a contract is ambiguous or when a dispute has arisen between the parties after a period of operation under the contract. *Id.* at ¶ 39.

**{¶67}** However, *St. Marys* reads in relevant part, "[w]here a dispute arises relating to an agreement under which the parties have been operating for some considerable period of time, the conduct of the parties may be examined in order to determine the construction that they themselves have placed upon the contract." *Id.* at ¶ 39. As the Participation Agreement was executed prior to the Assignment, the rule announced in *St. Marys* is inapposite.

Case Nos. 23 MO 0021, 23 MO 0023

**{¶68}** Third, Appellants contend the facts in *Cadle v. D'Amico*, 2016-Ohio-4747, ¶ 34 (7th Dist.) are strikingly similar to the facts in this case. In *Cadle*, the parties disputed the meaning of an assignment that conveyed "Assignor's interest in certain Oil & Gas Lease for the 'Sudimak #2 and #3 Well' [shallow wells] . . . ." *Id.* at ¶ 26. The dispute arose because deep wells were drilled on the property, and the assignee filed the action to recover the royalties from those wells. *Id.* at ¶ 15.

**{¶69}** The trial court concluded the assignment was ambiguous, then relied on extrinsic evidence to find the assignment conveyed only "royalty rights and [the] right to free gas for the residence associated with the [shallow wells]." *Id.* at ¶ 27. We affirmed the trial court's decision, reasoning the "consideration for the Assignment was predicated on royalties received from the [shallow wells] over the 18-month period prior to the execution of the Assignment." *Id.* "Had the assignment been intended to include additional interests," we opined, "the price would have been higher." *Id.* at ¶ 35.

**{¶70}** Although the facts in *Cadle* are similar to the facts in this case, there is a fundamental distinction. We have determined the Assignment in this case is unambiguous. Accordingly, our decision in *Cadle* is inapplicable because it was predicated upon ambiguity in the assignment in that case.

**{¶71}** Having considered Appellants' arguments with respect to the Participation Agreement, we find the trial court did not err in refusing to consider evidence outside the four corners of the Assignment. Accordingly, we find Appellants' third assignment of error has no merit.

## CONCLUSION

**{¶72}** In summary, the judgment entry of the trial court is reversed and vacated and judgment is entered in favor of Appellants on Appellees' claims for declaratory judgment, breach of contract, conversion, and unjust enrichment. Further, this matter is remanded to the trial court to address Gulfport's request for an order quieting title to its leasehold interest in the deep rights.

Waite, J., concurs.

Robb, P.J., concurs.

Case Nos. 23 MO 0021, 23 MO 0023

---

For the reasons stated in the Opinion rendered herein, it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Monroe County, Ohio, is reversed and vacated. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against the Appellees.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**